# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of: )<br>Information associated with accounts identified as )<br>Google accounts smneimne961@gmail.com and )<br>fcharrak0@gmail.com, which information is stored at )<br>premises controlled by Google, LLC, located at 1600 )<br>Amphitheatre Parkway Mountain View, CA 94043 ) | Case No.  21-MJ-02634 |

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A-1*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☒ Evidence of a crime;
☒ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to defraud the United States |
| 18 U.S.C. § 554 | Smuggling |
| 22 U.S.C. § 2278 | Conspiracy to violate AECA |
| 50 U.S.C. § 1705 | Conspiracy to violate IEEPA |
| 50 U.S.C. §§ 4819 | Conspiracy to violate ECRA |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*
Ryan Collins, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State: <u>Los Angeles, CA</u>

_____
*Judge's signature*
Hon. Charles F. Eick, U.S. Magistrate Judge
*Printed name and title*

AUSA: William M. Rollins (x7407)

## **ATTACHMENT A-1**

### **PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the SUBJECT ACCOUNTS identified as the following email accounts:

"smneimne961@gmail.com" and "fcharrak0@gmail.com" that are within the possession, custody, or control of Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, CA 94043, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

I.   **SEARCH PROCEDURES**

1.   The warrant will be presented to personnel of Google
LLC and Oath Holdings Inc. (the "PROVIDERS"), who will be
directed to isolate the information described in Section II
below.

2.   To minimize any disruption of service to third
parties, the PROVIDERS' employees and/or law enforcement
personnel trained in the operation of computers will create an
exact duplicate of the information described in Section II
below.

3.   The PROVIDERS' employees will provide in electronic
form the exact duplicate of the information described in Section
II below to the law enforcement personnel specified below in
Section IV.

4.   With respect to contents of wire and electronic
communications produced by the PROVIDERS (hereafter, "content
records," see Section II.10.a. below), law enforcement agents
and/or individuals assisting law enforcement and acting at their
direction (the "search team") will examine such content records
pursuant to search procedures specifically designed to identify
items to be seized under this warrant.  The search shall extract
and seize only the specific items to be seized under this
warrant (see Section III below).  The search team may use
forensic examination and searching tools, such as "EnCase" and
"FTK" (Forensic Tool Kit), which tools may use hashing and other

sophisticated techniques. The review of the electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDERS of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDERS will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the

Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   INFORMATION TO BE DISCLOSED BY THE PROVIDERS

10.  To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDERS, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDERS, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDERS are required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNTS, limited to that which occurred on or after October 1, 2016,[1] including:

---

[1] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

        i.   All e-mails, communications, or messages of
any kind associated with the SUBJECT ACCOUNTS, including stored
or preserved copies of messages sent to and from the account,
deleted messages, and messages maintained in trash or any other
folders or tags or labels, as well as all header information
associated with each e-mail or message, and any related
documents or attachments.

        ii.  All records or other information stored by
subscriber(s) of the SUBJECT ACCOUNTS, including address books,
contact and buddy lists, calendar data, pictures, videos, notes,
texts, links, user profiles, account settings, access logs, and
files.

        iii. All records pertaining to communications
between the PROVIDERS and any person regarding the SUBJECT
ACCOUNTS, including contacts with support services and records
of actions taken.

    b.   All other records and information, including:

        i.   All subscriber information, including the
date on which the account was created, the length of service,
the IP address used to register the account, the subscriber's
full name(s), screen name(s), any alternate names, other account
names or e-mail addresses associated with the account, linked
accounts, telephone numbers, physical addresses, and other
identifying information regarding the subscriber, including any
removed or changed names, email addresses, telephone numbers or
physical addresses, the types of service utilized, account
status, account settings, login IP addresses associated with

                              iv

session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

> (I)   the SUBJECT ACCOUNTS.

> ii.   All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNTS described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.   For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

> a.   All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (conspiracy to defraud the United States); 18 U.S.C. § 554 (smuggling); 22 U.S.C. § 2278 (conspiracy to violate the Arms Export Control Act); 50 U.S.C. §§ 4819 (conspiracy to violate the Export Control Reform Act); 50 U.S.C. § 1705 (conspiracy to violate the International Emergency Economic Powers Act);  and 18 U.S.C. § 1956 (money laundering), namely:

        i.    Information relating to who created, accessed, or used the SUBJECT ACCOUNTS, including records about their identities and whereabouts.

        ii.   Records, documents, programs, applications, materials, or conversations relating to the sale or purchase of guns or ammunition, including correspondence, receipts, records, and documents noting prices or times when guns or ammunition were bought, sold, exported, or otherwise distributed;

        iii. Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, export, or distribution of guns or ammunition;

        iv.   Contents of any calendar or date book;

        v.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

        vi. Pertaining to items, funds, and account numbers transferred, shipped, transshipped, exported and/or re-exported, items scheduled to be transferred, shipped, transshipped, and/or exported, or items intended to be transferred, shipped, transshipped, and/or exported from the United States to other foreign countries;

        vii. Pertaining to materials demonstrating knowledge by MNEIMNE, CHARRAK, or any other coconspirator of export and arms regulations and sanctions, export procedures, and licensing requirements;

          viii.    Identifying individuals assisting in the smuggling, transfer, export, re-export, shipment and/or transshipment of items, funds, or account numbers from the United States and/or the location of said individuals, including codenames, abbreviations, and references;

          ix. Describing or referencing financial or banking transactions associated with the suspected transfer, export, re-export, shipment and/or transshipment of unlawfully shipped goods, technology, services, account numbers, funds or services from the United States or abroad or on behalf of individuals or entities in Iran;

          x.  Describing or referencing business transactions related to the sale, potential sale, export, re-export, and transshipment of account numbers, goods or technology by MNEIMNE, CHARRAK, or any associated individuals, companies or subsidiaries;

          xi. Pertaining to the purchase for resale of goods or technology by MNEIMNE, CHARRAK, or any associated individuals, companies or subsidiaries;

          xii. Identifying the business contacts and customers of MNEIMNE and CHARRAK including materials reflecting customer lists, customer contact information, and customer addresses;

          xiii.    Identifying all means of communication (i.e., telephone numbers, other electronic accounts) used in the transfer, export, re-export, shipment, and/or transshipment of

items, account numbers, or funds from the United States or abroad;

xiv. Listing or describing items requested from the United States for use in other foreign countries;

xv. Describing or referencing any businesses owned or operated by MNEIMNE and CHARRAK or any associate, either foreign or domestic;

xvi. Identifying or referencing any United States person or foreign individual or entity engaging in the transfer, shipment, transshipment, export, re export, sale, solicitation, brokering, procurement, supply, financing, transportation, and/or freight forwarding of goods, technology, or services;

xvii.    Information relating to the export, re-export, transshipment, brokering, procurement, solicitation, sale (including any negotiation of terms in advance of any potential or actual sale), supply, financing, transportation, freight forwarding, and/or acquisition of firearms, account numbers, funds, firearm parts, goods, technology, or services;

xviii.    Information relating to payments for shipping services, firearm parts, or defense articles, including bank wires, invoices, and associated correspondence;

xix. Information relating to financial accounts maintained or used by MNEIMNE and CHARRAK and their associates.

xx. Information related to the conversion of illicit funds, such as the purchase of real estate, vehicles, previous stones and gems, antiquities, and other items of value.

viii

b.   All records and information described above in Section II.10.b.

## IV.   **PROVIDER PROCEDURES**

12.   IT IS ORDERED that the PROVIDERS shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDERS shall send such information to:

> Special Agent Ryan D. Collins
> Federal Bureau of Investigation
> 11000 Wilshire Blvd., Suite 1700
> Los Angeles, California 90024
> Phone Number: (323) 219-1763
> Rdcollins2@fbi.gov

13.   IT IS FURTHER ORDERED that the PROVIDERS shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant. IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDERS shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States.  Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDERS shall notify the agent identified in paragraph 12 above of its intent to so notify.

**AFFIDAVIT**

I, Ryan D. Collins, being duly sworn, declare and state as
follows:

## I.   INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of
Investigation ("FBI") and have been so employed since May 2018.
I am currently assigned to the Joint Terrorism Task Force
("JTTF") and based in the Los Angeles Field Office ("LAFO") of
the FBI.  From May 2018 through September 2018, I received
training at the FBI Training Center in Quantico, Virginia.  This
training included courses on conducting national security
investigations of counterterrorism and counterintelligence, as
well as criminal investigations of narcotics trafficking, white
collar crime, gangs and organized crime, and violent crime.  As
an FBI agent, I have investigated complex criminal conspiracies,
white collar crime, narcotics trafficking, gangs, violent crime,
public corruption, and terrorism.  I have participated in the
execution of numerous search and arrest warrants, including
searches of digital devices and communication facilities.  Based
on my training and experience with the FBI, I have become
familiar with the manner in which criminals use the Internet,
email, and digital devices to conduct their unlawful activities,
and how to search digital devices, email accounts, and other
communication facilities for evidence of criminal conduct.

## II.   PURPOSE OF AFFIDAVIT

2.   I make this affidavit in support of an application for
warrants for information associated with the following accounts

(each a "SUBJECT ACCOUNT" and collectively the "SUBJECT ACCOUNTS") at the following providers, each of which is a provider of electronic communication and remote computing services (collectively "PROVIDERS" or each individually a "PROVIDER"):[1]

       a.   Gmail account "smneimne961@gmail.com" ("SUBJECT ACCOUNT 1"), that is stored at premises controlled by Google LLC ("PROVIDER 1"), a provider of electronic communication and remote computing services, headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, as described further in Attachment A-1.

       b.   Gmail account "fcharrak0@gmail.com" (SUBJECT ACCOUNT 2"), that is stored at PROVIDER 1, as described further in Attachment A-1.

       c.   Yahoo Account nayefamhaZwnc@yahoo.com ("SUBJECT ACCOUNT 3"), that is stored at premises controlled by Oath Holdings Inc. ("PROVIDER 2"), a provider of electronic communication and remote computing services, headquartered at

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDERS pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

701 1st Avenue, Sunnyvale, California 94089, as described further in Attachment A-2.

3.     The information to be searched is described in Attachments A-1 and A-2.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d) to require the PROVIDERS to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

4.     As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. § 371 (conspiracy to defraud the United States); 18 U.S.C. § 554 (smuggling); 22 U.S.C. § 2278 (conspiracy to violate the Arms Export Control Act); 50 U.S.C. § 1705 (conspiracy to violate the International Emergency Economic Powers Act); 50 U.S.C. §§ 4819 (conspiracy to violate the Export Control Reform Act); and 18 U.S.C. § 1956 (money laundering) (collectively, the "Subject Offenses").[2]

_____

[2] The statutory background for the Subject Offenses is set forth in **Exhibit 1**, ¶¶ 8-24.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter.  Unless specifically indicated otherwise, all dates and times are approximate, and all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    The FBI and the U.S. Department of Homeland Security are investigating a conspiracy to illegally export machine gun parts from the United States to Lebanon.  As detailed further below and in the attached exhibit, there is probable cause to believe that, beginning in 2016 and continuing through at least December 2020, FARID CHARRAK ("CHARRAK") and her son, SAID MNEIMNE ("MNEIMNE"), conspired to purchase machine gun parts in the United States and unlawfully export them to Lebanon by falsifying shipping records and concealing them in innocuous goods and gifts.

7.    On June 19, 2020 the Honorable Alka Sagar, United States Magistrate Judge, signed federal warrants (the "JUNE 2020 WARRANTS") authorizing the search of two email accounts believed to be used in furtherance of the conspiracy: sa3doba3do@hotmail.com (the "SA3DOBA HOTMAIL ACCOUNT") and ramina.nano818@yahoo.com (the "RAMINA YAHOO ACCOUNT").  The

affidavit in support of the JUNE 2020 WARRANTS is attached
hereto as **Exhibit 1** and incorporated by reference as though set
forth fully herein.

8.   Emails obtained pursuant to the JUNE 2020 WARRANTS
show that the SA3DOBA HOTMAIL ACCOUNT and the RAMINA YAHOO
ACCOUNT received messages from SUBJECT ACCOUNT 1 – which is
registered under MNEIMNE's name – about the acquisition of gun
parts in the United States.  In addition, according to financial
and gun store purchase records, MNEIMNE used SUBJECT ACCOUNT 1,
SUBJECT ACCOUNT 2, and SUBJECT ACCOUNT 3 in connection with his
purchase of assault rifle parts and handguns at multiple gun
stores in the United States; some of those purchases used the
exact same street address and phone number previously listed
alongside the SA3DOBA HOTMAIL ACCOUNT to acquire gun parts,
which, as detailed further in **Exhibit 1**, was the email address
for the recipient of a package containing M-16 bolt carriers
concealed inside of a poker set destined for Lebanon but
intercepted by law enforcement.  Accordingly, as detailed
further below and in the attached affidavit, there is probable
cause to believe that the SUBJECT ACCOUNTS will contain evidence
of MNEIMNE, CHARRAK, and any unknown coconspirators' efforts to
unlawfully export gun parts from the United States to Lebanon.

## IV.   STATEMENT OF PROBABLE CAUSE

**A.   Emails Obtained Pursuant to the JUNE 2020 WARRANTS Show
that MNEIMNE Used SUBJECT ACCOUNT 1 for Gun Part
Transactions**

9.   On June 19, 2020, the Court authorized the JUNE 2020
WARRANTS for the SA3DOBA HOTMAIL ACCOUNT and the RAMINA YAHOO

ACCOUNT.  As detailed further in **Exhibit 1**, CHARRAK used both the SA3DOBA HOTMAIL ACCOUNT and the RAMINA YAHOO ACCOUNT to purchase M-16 gun parts from a gun store in Florida, and the SA3DOBA HOTMAIL ACCOUNT was listed as the recipient's email address for a shipment of M-16 gun parts concealed inside of a Texas Hold 'Em Poker Set destined for Lebanon.  CHARRAK is MNEIMNE's mother, and MNEIMNE lives at the same address in Van Nuys to which other M-16 parts were shipped before the unlawful attempted export.  See, e.g., **Exhibit 1** ¶¶ 26-27.

10.  After executing the JUNE 2020 WARRANTS, the FBI discovered the following email, among others:

a.  On August 25, 2019, SUBJECT ACCOUNT 1 sent an email to SA3DOBA HOTMAIL ACCOUNT, with the subject line as "dispute".  The email stated:

```
1. July 21 360.60 southwest
aug 12, 620. nikki
aug 8 650.90 omega
aug 16 $149.97 combat armory
aug 21  165.26 hot topic
8-24 71.47 macys
8-25 153.53 macys
8-23.1.1  34.96 macys
```

11.  Based on my review of purchase records obtained from gun suppliers, I believe that the August 25 email from SUBJECT ACCOUNT 1[3] to the SA3DOBA HOTMAIL ACCOUNT described multiple purchases at gun stores in the United States.  Specifically:

---

[3] According to Google LLC, as of May 28, 2020, the subscriber for SUBJECT ACCOUNT 1 was not specified. According to other records from Google, however, the display name used in an email sent from SUBJECT ACCOUNT 1 on August 25, 2019 was "Said Mneimne".

a.   On August 8, 2019, CHARRAK made a $650.90 purchase at an assault rifle distributor, Omega Manufacturing Inc. -- the same date and amount referenced next to "omega" in the email above between SUBJECT ACCOUNT 1 and SA3DOBA HOTMAIL ACCOUNT.  According to the corporation's website, the business is now called "Omega Tactical Distribution, formerly known as Omega Manufacturing Inc.," and is a "distributor of AR-15, LR308, tactical accessories, and other firearms parts."

b.   In addition, according to purchase records provided to the FBI by Combat Armory, MNEIMNE purchased three Combat Armory 7.5" 5.56 NATO 1:7 Pistol Length AR-15 Barrels for a total of $149.97 on August 16, 2019 – the same date and amount referenced next to "combat armory" in the email above between SUBJECT ACCOUNT 1 and the SA3DOBA HOTMAIL ACCOUNT.

12.  On April 19, 2020, the RAMINA YAHOO ACCOUNT forwarded an email to SUBJECT ACCOUNT 1.  The email was an order confirmation from Omega Manufacturing for a 10 pack of AR-15 complete bolt carrier groups.[4]  The billing contact information for the order confirmation was listed as "said mneimne, [RAMINA YAHOO ACCOUNT], 8187468199, 15835 vanowen st., 115, van nuys, ca, 91406 us".  As detailed further in the prior affidavit attached hereto as **Exhibit 1** (e.g., ¶¶ 25-27), both CHARRAK and

---

[4] Given that the RAMINA YAHOO ACCOUNT forwarded a purchase order confirmation to SUBJECT ACCOUNT 1 and firearm manufacturers have records of multiple purchases by MNEIMNE, I do not believe that any of the purchases described in the "dispute" email were fraudulent.  Instead, based on the evidence gathered to date and detailed further in **Exhibit 1,** I believe that MNEIMNE or CHARRAK may have been fraudulently disputing their own transactions, although the FBI's investigation of this aspect of their potential criminal conduct remains ongoing.

MNEINME have used this street address (the "VANOWEN ADDRESS") in connection with multiple financial transactions and gun part shipments in the past.  The VANOWEN ADDRESS was also used to purchase and receive a shipment of ten M-16 lower parts kits shortly before CBP officers discovered eight M-16 rifle bolt assemblies concealed inside of a poker card game box set destined for Lebanon, for which the SA3DOBA HOTMAIL ACCOUNT was listed as the recipient.  (Id.)  Moreover, as explained further below, MNEIMNE used SUBJECT ACCOUNT 1 to purchase "10 SAA AR-14/M16" complete bolt carriers several months before CBP intercepted the shipment containing concealed M-16 bolt carriers intended for Lebanon.

**B.   Financial and Gun Store Purchase Records Show that MNEIMNE and/or CHARRAK Used All Three SUBJECT ACCOUNTS to Acquire Gun Parts and Ammunition**

13.  Based on my review of financial records provided to the FBI by JP Morgan Chase Bank for an account in CHARRAK's name, I know that the JP Morgan Chase Bank account was used to make two purchases from Combat Armory LLC in 2019, and that the same account was used to make a purchase from Surplus Ammo LLC in 2020.

14.  According to records from Combat Armory LLC:

a.   Between March 21, 2019 and November 15, 2019, MNEIMNE made eight separate purchases from Combat Armory totaling $3,961.91.

b.   All eight purchases involved weapon parts for AR-15 assault rifles and nine-millimeter handguns.  Two of the eight purchases had a billing address of 1266 Benicia Street,

#3, San Diego, CA 92110.  Six of the eight purchases used the VANOWEN ADDRESS for billing purposes.

c.   Five different email addresses were provided to Combat Armory in connection with the eight purchases: the SA3DOBA HOTMAIL ACCOUNT, "saidm@myimprov.com," SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, and SUBJECT ACCOUNT 3.

d.   For example, on March 21, 2019, MNEIMNE used SUBJECT ACCOUNT 1 as the confirmation email address for the purchase of "10 Combat Armory 7.5" 5.56 NATO 1:7 Pistol Length AR-15 Barrels - $439.90" and "10 Combat Armory mil-spec Lower Receiver Parts Kits - $349.90."  Similarly, on October 8, 2019, MNEIMNE again used SUBJECT ACCOUNT 1 as the confirmation email address for the purchase of "10 Combat Armory AR15 .223/.223 Wylde/300acc blackout/5.56 NATO Mil-Spcc Bolt Carrier Groups - $649.90" and "1 Combat Armory Thread Protector ½ x 28 (9mm & .357SIG Barrel) - $7.99."

e.   In addition, on November 15, 2019, Combat Armory records show that MNEIMNE purchased 10 Combat Armory 7.5" 5.56 NATO 1:7 Pistol Length AR-15 Barrels for $499.90.  MNEIMNE listed SUBJECT ACCOUNT 2 as his email contact information for the purchase.

f.   Furthermore, on August 16, 2019, Combat Armory records show that MNEIMNE purchased 3 Combat Armory 7/5" 5.56 NATO 1:7 Pistol Length AR-15 Barrels for $149.97.  MNEIMNE listed SUBJECT ACCOUNT 3 as his email contact information for the purchase.

g.   All eight purchases used the same billing and
shipping phone number of 818-746-8199.  As detailed further in
**Exhibit 1**, MNEIMNE has repeatedly described this as his own
phone number (e.g., ¶ 27).  In connection with a separate
purchase of M-16 gun parts in March of 2020, CHARRAK also listed
this phone number (818-746-8199) as contact information
alongside the SA3DOBA HOTMAIL ACCOUNT, the same e-mail account
identified as the recipient of the M-16 parts later concealed in
a poker set and destined for Lebanon (**Exhibit 1**, ¶¶ 25-26).

15.   In addition to the purchases from Combat Armory,
according to records provided to the FBI by Surplus Ammo LLC, on
December 10, 2019, MNEIMNE also used SUBJECT ACCOUNT 1 as the
confirmation email address for the purchase of "10 SAA AR-14/M16
Complete Bolt Carrier Groups - Subtotal $549.90."  Records
obtained from PayPal show that SUBJECT ACCOUNT 1 was also used
to purchase a variety of gun parts in May of 2018, including
parts for Glock handguns, stainless steel spring housing, and
rifle stocks.

16.   According to Combat Armory and Surplus Ammo LLC, both
gun stores routinely send purchase receipts to their customers
via email addresses listed on purchase orders such as the
SUBJECT ACCOUNTS.

**F.   The PROVIDERS Have Preserved Information Associated with
the SUBJECT ACCOUNTS**

17.   On March 9, 2021, the FBI sent preservation letters to
PROVIDER 1 asking that the contents of SUBJECT ACCOUNT 1 and
SUBJECT ACCOUNT 2 be preserved pursuant to 18 U.S.C. § 2703(f).

18.  On March 23, 2021, the FBI sent preservation letters to PROVIDER 2 asking that the contents of SUBJECT ACCOUNT 3 be preserved pursuant to 18 U.S.C. § 2703(f).

### V.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

19.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

a.  Persons who possess, purchase, or illegally export firearms and firearm parts often maintain records of their firearm transactions in email accounts.  It has been my experience that individuals who illegally export weapons will keep the contact information of the purchaser or coconspirator abroad for future purchases or referrals.

b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms in their social media or email accounts or digital devices.  These photographs and recordings are often shared via social media, email messages, and over text messaging applications.

c.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience,

individuals who engage in the export of firearms or firearm parts frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that they sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess in their email accounts as they frequently send these photos to each other to facilitate sales or transfers of firearms.

## VI.   BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDERS

20.   In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.  Providers, like the PROVIDERS, allow subscribers to obtain accounts like the SUBJECT ACCOUNTS.  Subscribers obtain an account by registering with the provider.  During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records.  In my training and experience, such information may constitute evidence of the crimes under

investigation because the information can be used to identify the user(s) of an account.

21.  Therefore, the computers of the PROVIDERS are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDERS' services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

22.  A subscriber of the PROVIDERS can also store with the PROVIDERS files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDERS.  In my training and experience, evidence of who was using an account may be found in such information.

23.  In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other

log files that reflect usage of the account.  In addition, e-mail and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access SUBJECT ACCOUNTS.

24.  In my training and experience, e-mail and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of e-mails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of SUBJECT ACCOUNTS.

25.  I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be

created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account. Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was. Often those pieces will come from a time period before the account was used in the criminal activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account. Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of SUBJECT ACCOUNTS, I am requesting a warrant requiring the PROVIDERS to turn over all information associated with a SUBJECT ACCOUNTS with the date restriction included in Attachment B for review by the search team.

26. Relatedly, the government must be allowed to determine whether other individuals had access to the SUBJECT ACCOUNTS. If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

27.   I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

28.   This application seeks a warrant to search all responsive records and information under the control of the PROVIDERS, which is subject to the jurisdiction of this court, regardless of where the PROVIDERS have chosen to store such information.

29.   As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDERS, under seal, until the

investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.   I make that request because I believe it might be impossible for a provider to authenticate information taken from the SUBJECT ACCOUNTS as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from the SUBJECT ACCOUNTS.

b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VII. <u>SERVICES PROVIDED BY GOOGLE LLC</u>

30.   The SUBJECT ACCOUNT[5] "smneimne961@gmail.com" has signed up for the following Google LLC services: Web & App Activity, Gmail, Google Hangouts, iGoogle, Google Drive, Google Services, Google Subscribed Links, Google Docs, Google Payments, Google Calendar, YouTube, Blogger, Google Chrome Sync, Google Developers Console, Google Photos, Android, Lock SafeSearch, Google Offers, Google Cloud Print, Google Maps Engine, Location History, Google Play Music, Google URL Shortener, Google My Maps, Wallet Transfer, Google Voice, Dynamite, Geo Madden.

31.   In my training and experience, I have learned that Google provides a variety of online services, including e mail, document storage, mobile operating systems, translation services, software coding tools, malware analysis, social media accounts, applications development tools, video and photograph sharing and storage, web feed management tools, personalized home pages, news aggregation tools, a Google account "dashboard" tool, an online retail storefront offering applications for free and for sale, website analytic tools, calendars, web browsers, mapping tools, location tracking tools, and telephone and voice-mail transcription to the public.

32.   Google offers numerous services which enhance the user's Internet experience, including Google Dashboard, Google Reader, Google News, and Google Groups.  Google News and the now-discontinued Google Reader are website feed aggregators that

---

[5] SUBJECT ACCOUNT fcharrak0@gmail.com's Google LLC services are not known at this time.

allowed a user to view website articles and news in one
centralized location.  Google Groups are e mail groups whereby
one person can send an e mail to an e mail address that serves
as the "group," and the message or e mail is either or both
posted to a centralized location and/or sent to everyone who is
currently subscribed to the group via e mail; each group is
generally set up using a Google account.

33.  Evidence of who it is that a user of an e mail or
social media account had contacted and for what purpose can also
reside in the information likely stored on a SUBJECT ACCOUNT at
Google.  For example, photographs can be stored not only as
attachments to e mails, but they can be linked to a particular
contact stored in connection with an e mail account, they can be
stored in connection with a particular "friend" or event on a
discontinued Google+ account, or they can be stored in a Google
Photos (formerly Picasa) web album.  Albums can be compiled for
a particular trip or occasion, documenting who was present, when
it took place, and where it was -- for example by recovering
location information that is sometimes stored in metadata or
what is referred to as "EXIF data" on digital photographs.
Likewise, personal videos can be uploaded to or downloaded from
video services such as Google's YouTube.  All of this data can
assist in identifying the true identity of the account user and
persons with whom the user of the account has been in contact.

34.  Aside from photos, the discontinued Google+, and the
discontinued iGoogle are social networking services similar to
Facebook.  Data residing on Google+, and iGoogle accounts is

likely to provide information regarding the true identity of the person(s) using a SUBJECT ACCOUNT, the identities of persons with whom the user of a SUBJECT ACCOUNT has been in contact, the nature of those contacts, and whether any such contacts were related to the subject matter of the investigation described above.  Furthermore, a user's history that relates to web browsing, web searches, and certain activity related to Google services or applications (or "apps") are stored in an account's Google History, or Google Web & App Activity.

35.  In addition to storing photographs, calendars, and other evidence related to social media, a subscriber can also sign up for other services at Google, such as Google Drive and Google Docs, which allow users to store any kind of documents.

36.  Further, Google Maps provides a mapping tool that allows users to save locations, such as their home and work locations, create custom maps, make changes and edits to public places, "star" locations, and create private labels for locations.  Google Location History provides Global Positioning System (GPS) location information.  All of these services can be used to identify where an individual is and has been physically located.  Google also in some instances maintains records of the nearby wireless or "Wi-Fi" access points (that can be used to connect to the Internet) or the cell towers connected to a device that is accessing a Google account.

37.  Google offers services which interpret and translate text, including Google Translate (which allow users to paste text in one language that will be translated into another) and

Google Translator Toolkit (which includes more functionality and collaboration), which can translate text in 345 source languages into 345 target languages.  The translation service is Internet-based, so it can be used by the user of an account to translate e mails received as well as websites visited.

38.  Over the last several years, Google has developed a number of mobile telephone technologies, including the development of the Android mobile operating system, Android Market, and Google Talk.  The Android operating system is used on the majority of the world's touch-screen mobile devices and smartphones, and facilitates the downloading and running of games and applications, sending of text and voice messages, connecting to and searching the Internet, and providing of GPS and location services, camera services for the taking of photographs and videos (including video calling), clock and calendar services, and e mail services, and storing of contact lists and documents.  The Google Play service provides the virtual storefront at which applications can be downloaded and updated.  Google Talk is an instant messaging service that provides both text and voice communication.  I know from experience that Android applications including these are generally downloaded from the Android Market and Google Play services.

39.  Google also uses "unique application numbers," which Google uses to record information such as the operating system type and the application version number used to access Google by a particular device.  Google maintains these unique application

numbers to track and collect information related to a particular device accessing Google services, which is recognized when updating Google services or software on a device using a Google account.

40.   Google offers a service called Google Hangouts, which allows Google users to communicate by means of video calls, phone or audio calls, or written messages.

41.   Google also offers its own web browser, a program called Google Chrome, which can be used instead of other web browsers such as Microsoft Internet Explorer or Mozilla Firefox. Users who have a Google account can use Google Chrome on multiple devices, and can decide which information "syncs" or synchronizes across multiple devices that are running Google Chrome.  Devices that can be synced include computers, Google's own computers called Chromebooks, devices running Google's own Android operating system, or iPhones or iPads (devices made by Apple, Inc. that use Apple's proprietary operating system). Users have the option to sync all data across multiple devices, or only certain information by checking certain boxes, and can choose to require a passphrase to sync between different computers as well as to encrypt any passwords stored by Google Chrome.

42.   Depending on whether a user of a Google account implemented Google's two-factor authentication system (which can require the user to enter both a user-name and password and a code sent to one's cell phone), Google may also have authentication logs of when the user successfully authenticated

or identified him- or herself when logging into an account. Similarly, for certain mobile devices, a password for the specific "app" installed on the mobile device may be generated and used to maintain access.

43.  For this reason, Attachment B in the requested warrant to Google requires Google to provide information related to any Google service used by a SUBJECT ACCOUNT, as the user/s of the SUBJECT ACCOUNT may have enrolled in new services since the subscriber records were obtained from Google on June 09, 2020.

## VIII.    INFORMATION STORED BY GOOGLE THAT RELATES TO ANDROID DEVICES

44.  As mentioned above, Google offers a free mobile operating system (OS) product called Android.  When a new device is established running the Android OS, it is assigned an Android ID and if the device has a telephony module, it likely has an International Mobile Equipment Identity (IMEI) number, which may be interchangeable with an Android ID.  Google and other providers of e mail and social media use various identifiers, such as Global Unique Identifiers or "GUIDs," to track users and the devices users are using as well.

45.  The Android OS will also assign a user-specific "Advertising ID" that can be used by users and developers to control and monetize the applications they develop.

46.  I know from my experience and by receiving information from employees familiar with the Android developer toolkit that Google stores certain information relating to each Android device that is activated.

47.   Among the information that Google stores are records
that might indicate who the owner of the IMEI/Android ID is,
such as the Google account that was used to establish the
Android device, Google accounts accessed by the device, records
related to the hardware device the Android OS is operating on, e
mail accounts associated with the IMEI/Android ID, IP addresses
used by the device and used to access the Google account, search
queries performed on the Android device, web browsing performed
on the Android device, machine cookie information for the
Android device, images used to establish the Google "Face
Unlock" feature, phone call logs, text message content, stored
voice-mails, contact lists stored on the device, stored
photographs, the phone number of the device, applications or
"apps" downloaded by the device, apps currently and historically
accessed by the device, bookmarks, favorites lists, memos and
files saved to the device, and device security settings.  Some
of these applications or "apps" store or back-up data remotely
to Google, rather than only storing it locally on the device or
phone itself.

48.   Additionally, Google allows users to sync certain
applications to the Android account that can be used to identify
the identity of the user of the device.

49.   Google also stores information related to the location
of the Android device, including clock and time zone settings,
Global Positioning System (GPS) location history, language
codes, and Google Maps location information.

50.   Google provides cloud services which allow a user to save content on the Android device to the cloud; in the event the device malfunctions the user is able to quickly recover their data and information from this cloud back-up image.

## IX.   REQUEST FOR NON-DISCLOSURE

51.   Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDERS not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNTS, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.   There is reason to believe that such notification will result in: (1) flight from prosecution; (2) destruction of or tampering with evidence; (3) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing the investigation.   The current investigation set forth above is not public, and I know, based on my training and experience, that arms traffickers often will destroy digital evidence if they learn of an investigation. In addition, if the PROVIDER or other person notifies the targets of the investigation that a warrant has been issued for the SUBJECT ACCOUNTS, the targets are likely to alter their activity and seriously jeopardize the investigation.

## X.   <u>CONCLUSION</u>

52.   Based on the foregoing, I request that the Court issue the requested warrant.  The government will execute this warrant by serving the warrant on the PROVIDERS.  Because the warrant will be served on the PROVIDERS, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2021.


_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

**EXHIBIT 1**

**AFFIDAVIT**

I, Michael B. Hyland, being duly sworn, declare and state as follows:

<h1 style="text-align:center">I.    <u>INTRODUCTION</u></h1>

1.     I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and have been so employed since November 2009.  I am currently assigned to the Joint Terrorism Task Force ("JTTF") and based in the Los Angeles Field Office ("LAFO") of the Federal Bureau of Investigation ("FBI").  From June 2009 through November 2009, I received training at the Federal Law Enforcement Training Center in Glynco, Georgia.  This training included courses on conducting criminal investigations of narcotics trafficking, organized crime, counterproliferation crimes, and transnational gangs.  Previously, I was employed as a Special Agent with the U.S. Air Force Office of Special Investigations, beginning in June 2000.

2.     While at HSI, I have investigated complex criminal conspiracies and acts of bank and wire fraud, immigration and trade fraud, money laundering, export offenses, weapons trafficking, and intellectual property crimes.  As an HSI SA, I have participated in the execution of numerous search and arrest warrants, including the search of digital devices and communication facilities.  I have received informal and formal training on how criminals use the Internet and digital devices to conduct their unlawful activities and how to search digital

devices and communication facilities for evidence of criminal conduct.

## II.    PURPOSE OF AFFIDAVIT

3.    I make this affidavit in support of an application for warrants for information associated with the following accounts (each a "SUBJECT ACCOUNT" and collectively the "SUBJECT ACCOUNTS") at the following providers, each of which is a provider of electronic communication and remote computing services (collectively "PROVIDERS" or each individually a "PROVIDER"):[1]

a.    Hotmail account "sa3doba3do@hotmail.com" ("SUBJECT ACCOUNT 1"), that is stored at premises controlled by Microsoft Corporation ("PROVIDER 1"), a provider of electronic communication and remote computing services, headquartered at 1 Microsoft Way, Redmond, Washington 98052.

b.    Yahoo account "ramina.nano818@yahoo.com" ("SUBJECT ACCOUNT 2"), that is stored at premises controlled by Oath Holdings Inc. ("PROVIDER 2"), a provider of electronic

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDERS pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

communication and remote computing services, headquartered at 701 1st Avenue, Sunnyvale, California 94089.

4. The information to be searched is described in Attachments A-1 and A-2. This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d) to require the PROVIDERS to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

5. As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. § 371 (conspiracy to defraud the United States); 18 U.S.C. § 554 (smuggling); 22 U.S.C. § 2278 (conspiracy to violate the Arms Export Control Act); 50 U.S.C. § 1705 (conspiracy to violate the International Emergency Economic Powers Act); 50 U.S.C. §§ 4819 (conspiracy to violate the Export Control Reform Act); and 18 U.S.C. § 1956 (money laundering) (collectively, the "Subject Offenses").

6. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from other agents and witnesses. This
affidavit is intended to show merely that there is sufficient
probable cause for the requested warrant and does not purport to
set forth all of my knowledge of or investigation into this
matter. Unless specifically indicated otherwise, all dates and
times are approximate, and all conversations and statements
described in this affidavit are related in substance and in part
only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7. As detailed below, HSI is investigating a criminal
scheme to illegally export machine gun parts from the United
States to Lebanon. There is probable cause to believe that,
beginning in 2016 and continuing through at least April 2020,
FARID CHARRAK ("CHARRAK") and her son, SAID MNEIMNE ("MNEIMNE"),
conspired to purchase machine gun parts in the United States and
unlawfully export them to Lebanon. CHARRAK and MNEIMNE
concealed the gun parts in innocuous goods and gifts and
falsified shipping records. Moreover, CHARRAK and MNEIMNE used
the SUBJECT ACCOUNTS to purchase the gun parts, prepare shipping
labels and records, and to conduct financial transactions
related to the smuggling conspiracy.

### IV. <u>APPLICABLE LAW</u>

**A. The International Emergency Economic Powers Act**

8. The International Emergency Economic Powers Act
("IEEPA"), 50 U.S.C. §§ 1701-1706, grants the President of the
United States ("the President") the authority to regulate
exports and other international transactions in times of

national emergency. IEEPA controls are triggered by an Executive Order declaring a national emergency based on an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."

9. Pursuant to IEEPA, 50 U.S.C. § 1705(a), (c), it is a crime for a person to willfully commit, willfully attempt to commit, willfully conspire to commit, or willfully cause a violation of any license, order, regulation, or prohibition issued under IEEPA, including the Export Administration Regulations ("EAR"), 15 C.F.R. § 730-774.

**B.   The Export Administration Regulations**

10. On August 17, 2001, under the authority of IEEPA, the President issued Executive Order 13222, implementing the EAR by declaring a national emergency with respect to the unrestricted access of foreign parties to United States goods and technologies. The President has issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by the Executive Order through the present.

11. Among other things, the EAR restricts the export of certain goods and technologies unless authorized by the Department of Commerce ("DOC") through the issuance of a valid export license by its Bureau of Industry and Security ("BIS"). Certain goods and technologies that have commercial applications but also could make a significant contribution to the military or nuclear potential of other nations and could be detrimental

to the foreign policy or national security of the United States are commonly referred to as "dual-use" items.  The Commerce Control List or "CCL," which is contained in the EAR at 15 C.F.R. § 774, Supplement 1, categorizes dual-use items controlled for export by the Department of Commerce.  Items on the CCL are identified by an Export Control Classification Number ("ECCN") that sets forth a description of the controlled commodity or technology, its licensing requirements, any potential license exceptions, and the reasons for its export control.

12.  As noted above, each ECCN specifies the applicable reasons for control (such as national security, crime control anti-terrorism, etc.).  By referencing the reasons for control set forth in the applicable ECCN, the Commerce Country Chart specifies for which countries a license is required before a commodity may be exported there.  See 15 C.F.R. § 738, Supp. No. 1.

**C.    The Export Control Reform Act of 2018**

13.  On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which includes provisions on export controls, entitled the Export Control Reform Act ("ECRA") of 2018, Pub. L. No. 115-232, tit. 17, subtitle B, 132 Stat. 2208 (2018), which has since been codified at 50 U.S.C. §§ 4801-4852.  In part, ECRA provides permanent statutory authority for the EAR.  For conduct that predates August 13, 2018, IEEPA is the controlling statute.  For conduct

6

occurring after August 13, 2018, ECRA is the controlling statute.

14.   Like IEEPA, ECRA makes it a crime for a person to willfully commit, willfully attempt to commit, willfully conspire to commit, or willfully cause a violation of any regulation, order, license, or other authorization issued under ECRA, including the EAR.  See 50 U.S.C. § 4819(a)(1), (b).

**D.    The Arms Export Control Act**

15.   The Arms Export Control Act ("AECA"), Title 22, United States Code, Section 22 U.S.C. § 2778, authorized the President to control the export of "defense articles" deemed critical to the national security and foreign policy interests of the United States.  In doing so, the AECA authorized the President to designate those items considered "defense articles" and to promulgate regulations for the import and export of such articles and services.  The items so designated constitute the United States Munitions List ("USML").  By lawful executive order, the President delegated authority to the United States Department of State.  Pursuant to that authority, the State Department's Directorate of Defense Trade Controls ("DDTC") is charged with controlling the export and temporary import of defense articles and defense services covered by the USML. Pursuant to that authority, the DDTC promulgated the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Parts 120-130, to implement the AECA.  The USML is included in the ITAR at § 121.1.

16.  In general, the AECA prohibits willful violations of its provisions, including exporting "defense articles" identified on the USML without a license, and of any regulations and rules issued under the AECA.  22 U.S.C. § 2778(b)(2), (c).

17.  Specifically, pursuant to § 127.1(a)(1) of the ITAR, it is unlawful to export or attempt to export from the United States, or to re-export or attempt to re-export from one foreign destination to another foreign destination, defense articles, without first obtaining the required license or written approval from the DDTC.  Section 127.1(a) provides that, without first obtaining a license or other written approval from the DDTC, it is unlawful:

> (1) To export or attempt to export from the United States any defense article [ ] for which a license or written approval is required by this subchapter . . .

> (2) To reexport or retransfer or attempt to reexport or retransfer any defense article [ ] from one foreign end-user, end-use, or destination to another foreign end-user, end-use, or destination for which a license or written approval is required by this subchapter, including, as specified in § 126.16(h) and § 126.17(h) of this subchapter, any defense article [ ] that was exported from the United States without a license pursuant to any exemption under this subchapter . . .

> (4) To conspire to export, import, reexport, retransfer, furnish or cause to be exported, imported, reexported, retransferred or furnished, any defense article [ ] for which a license or written approval is required by this subchapter.

**E.  Unlawful Export Information Activities**

18.  Title 13, United States Code, Section 305 (Unlawful Export Information Activities) provides in relevant part:

> (a) Criminal Penalties

> (1)  Failure to file; submission of false or misleading information.  Any person who knowingly fails to file or

knowingly submits false or misleading export information through the Shippers Export Declaration (SED) (or any successor document) or the Automated Export System (AES) shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both.

19.   I know from my training and experience that the DOC, through the U.S. Census Bureau ("Census"), requires the filing of electronic export information ("EEI"), the electronic successor document to the SED, through the AES pursuant to 13 U.S.C. § 305, 15 C.F.R. Part 30 (the Foreign Trade Regulations ("FTR"), and other regulations.  The purpose of these requirements is to strengthen the United States government's ability to prevent the export of certain items to unauthorized destinations and end-users because the AES aids in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation.  15 C.F.R. § 30.1(b).

20.   At all times relevant to the matters alleged herein, an EEI was required to be filed for, among other things, the export of commodities valued over $2,500 per the Harmonized Tariff Schedule of the United States of America ("HTSUSA") commodity classification code or any commodity requiring an export license, and was required to contain, among other information, the names and addresses of the parties to the transaction, and the description, quantity, and value of the items exported.  15 C.F.R. § 30.6(a).

## F.   Smuggling Goods from the United States

21.   Title 18, United States Code, Section 554 (Smuggling Goods from the United States) provides:

Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both.

**G.  Money Laundering**

22.  Title 18, United States Code, Section 1956 outlaws four kinds of money laundering - promotional, concealment, structuring, and tax evasion - committed or attempted under one or more of three jurisdictional conditions (i.e., laundering involving certain financial transactions, laundering involving international transfers, and stings).  As relevant here, Section 1956(a)(1) outlaws financial transactions involving the proceeds of other certain crimes - predicate offenses referred to as "specified unlawful activities" (or "SUAs") committed or attempted (1) with the intent to promote further predicate offenses; (2) with the intent to evade taxation; (3) knowing the transaction is designed to conceal laundering of the proceeds; or (4) knowing the transaction is designed to avoid anti-laundering reporting requirements.  Sections 1956(c)(7)(A), (B)(v)(II), and (D) define "specified unlawful activity" to include violations of IEEPA and the EAR, among other offenses.

23.  Section 1956(a)(2) outlaws the international transportation or transmission (or attempted transportation or transmission) of funds (1) with the intent to promote SUAs; (2) knowing that the purpose is to conceal laundering of the funds

10

and knowing that the funds are the proceeds of a predicate offense; or (3) knowing that the purpose is to avoid reporting requirements and knowing that the funds are the proceeds of a predicate offense.

24. Section 1956(h) provides that "[a]ny person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

## V.     STATEMENT OF PROBABLE CAUSE

### A.     CBP Intercepts Machine Gun Parts in Van Nuys Destined for Lebanon, and SUBJECT ACCOUNT 1 is the Recipient's Email Address

25. Based on my conversations with CBP officers, my review of the officers' reports, and my review of shipping records from DHL, I know the following:

a. In April of 2020, U.S. Customs and Border Protection ("CBP") officers in Van Nuys inspected a suspicious package bound for Beirut and discovered eight M-16 Bolt Carrier Groups (also known as rifle bolt assemblies)[2] concealed inside a Texas Hold 'Em poker set. According to the shipping invoice, the package was intended for delivery to a hair salon in Beirut,

---

[2] The rifle bolt assembly on an M-16 is the part of the rifle that is responsible for performing semiautomatic fire when the trigger is pulled. This occurs in a series of four steps: (1) allowing the firing pin to strike the primer on the chambered round; (2) grabbing and ejecting the spent shell casing from the fired round; (3) re-cocking the hammer in the lower receiver for the next round; and (4) grabbing a new round from the magazine and chambering it.

and SUBJECT ACCOUNT 1 was listed as the recipient's email address.[3]  Specifically:

i.   On April 29, 2020, DHL employees assigned to an international mail facility in Van Nuys were x-raying packages before loading them onto international flights for delivery.  When DHL employees scanned a package that, according to the shipper,[4] contained a gaming set and chips for Texas Hold 'Em poker, the employees noticed dense items inside that did not seem to match the shipper's description of the contents.  A DHL employee then emailed the x-ray images to CBP for further review.

ii.  On April 30, 2020, CBP officers reviewed the images sent by the DHL employee, as well as the shipping paperwork.  Based on the CBP officers' review:

(I)   The x-ray images suggested that something was inside the box that was not, in fact, part of a poker set.

(II)  The weight of the package was 11 pounds with a declared value of $120.

---

[3] For national security and regional stability reasons, M-16 rifle bolt assemblies cannot be exported to Lebanon without a license from the U.S. Department of Commerce; as discussed further below, the shipper obtained no such license here.

[4] The package displayed waybill number "26 6475 8224." A "waybill" is a document issued by a carrier giving details and instructions relating to the shipment of a consignment of goods. Typically, it will show the names of the consignor and consignee, the point of origin of the consignment, its destination, and route.  A waybill number is specifically assigned to each parcel of mail.

(III)     The ultimate destination of the package was Hisham Zain el Din Hair Salon in Beirut, Lebanon.

(IV) The receiver's email address was listed as SUBJECT ACCOUNT 1.[5]

(V)  The sender was listed as Eagle PO Box Rentals, IBS, Gohar Sarkisyan ("Sarkisyan"), 10645 Sherman Way, Suite H, Van Nuys, CA.  The sender's phone number was listed as 818-994-5006.[6]

iii. In light of the suspicious x-ray images, the heavy weight of the package, and its comparably low declared value given its weight, CBP decided to conduct a border search.

iv.  During the search of the package, CBP officers discovered eight M-16 rifle bolt assemblies concealed inside the poker card game box set.

## B.  CHARRAK Uses SUBJECT ACCOUNT 1 to Acquire M-16 Parts from a Gun Supplier in Florida

26.  Based on my conversations with T.W., the owner of an M-16 supply store in Florida who contacted HSI[7] to report two

---

[5] As detailed further below, SUBJECT ACCOUNT 1 has been repeatedly used by CHARRAK to purchase machine gun parts.

[6] Based on financial records and the company's publicly available business website, Sarkisyan appears to be the owner of Eagle PO Box Rentals, which leases mailboxes to customers for a fee.  The shipper's purported phone number - 818-994-5006 – is the number for Eagle PO Box Rentals.  Based on my training and experience, I know that criminals who conceal contraband in the mail frequently use fake, non-specific, or untraceable sender information (e.g. PO Box facilities) in order to disguise their identities.

[7] T.W. initially contacted HSI in Florida, where he has cooperated voluntarily (without compensation or any benefits) with HSI in the past; Florida agents referred the investigation to HSI agents in Los Angeles because the recipient was in the L.A.-area.

13

large purchases of M-16 parts by the same customer at different addresses just a few weeks apart, as well as my review of emails and business records provided to me voluntarily by T.W., I know the following:

a.    On March 16, 2020, T.W. received an online order for ten M-16 lower parts kits (which T.W. described as capable of being used in military-grade weapons) for a total of $821.90. The order was placed by CHARRAK, who paid with a Visa Debit card ending in 8291.

b.    CHARRAK listed her billing and shipping address as 15835 Vanowen Street, Apartment #115, Van Nuys, California (the "Vanowen Address"), her phone number as 818-746-8199, and her email address as SUBJECT ACCOUNT 1, the same account listed as the recipient of the concealed shipment of M-16 parts intercepted by CBP.

c.    T.W. charged the credit card, shipped the parts to the Vanowen Address, and emailed the invoice with purchase details along with an International Traffic in Arms Regulation ("ITAR") export warning to SUBJECT ACCOUNT 1.   The warning stated, for example, that some of the items listed on the gun store owner's website were subject to ITAR, and that "export is strictly prohibited without authorization or a license issued by the U.S. Department of State's Directorate of Defense Trade Controls."

d.    The warning also stated that by "proceeding with a transaction to purchase any ITAR restricted item(s)," the customer certified that "(i) the purchase does not require M16

Parts Supply LLC to export such items, unless [the gun store] is aware of the export and has obtained the appropriate U.S. Government authorization;" (ii) "the Customer does not intend to export such items after receipt from [the gun store] without the appropriate U.S. Government export authorization;" or (iii) "the Customer does not intend to export, transfer, sell, or furnish the item to any foreign person, whether abroad or in the U.S., including any Foreign Embassy in the U.S., without the appropriate U.S. Government export authorization[.]"

## C. CHARRAK Uses SUBJECT ACCOUNT 2 to Purchase Additional M-16 Parts from the Florida Gun Supplier

e.     About a month after the purchase described above, T.W. received a second online purchase order from CHARRAK for fifteen M-16 lower parts kits that are capable of being used in military-grade weapons, $1,221.85 on April 18, 2020.  CHARRAK paid with a different Visa credit card ending in 9080.

f.     Once again, the phone number associated with the purchase was 818-746-8199.  This time, however, CHARRAK listed the shipping address as 10936 Irma Avenue, Tujunga, California (the "Tujunga Address") and listed her email address as SUBJECT ACCOUNT 2.

g.     T.W. charged the credit card and shipped the parts to the Tujunga Address.  The parts arrived on May 6, 2020.  Additionally, T.W. emailed the invoice of the purchase details and the ITAR export warning notification to SUBJECT ACCOUNT 2.

h.     On May 7, 2020, CHARRAK emailed T.W. via SUBJECT ACCOUNT 2 and claimed that she wanted to return the parts for a

15

full refund.[8]  On May 14, 2020, CHARRAK emailed T.W. again via
SUBJECT ACCOUNT 2 and stated she was returning the parts because
they were mistakenly delivered to her uncle's house and the
uncle did not want to take possession of the package.  CHARRAK
then asked if T.W. could resend the returned parts to the
Vanowen Address.

i.   T.W. responded to CHARRAK via email to SUBJECT
ACCOUNT 2 that it was possible to reroute the shipment, but that
it would take a few weeks to ship due to significant order
backlog.[9]

**D.   CHARRAK and Her Son MNEIMNE Both Use SUBJECT ACCOUNT 1 and the Vanowen Address, and MNEIMNE Previously Made at Least One Large Shipment to Lebanon in 2016**

27.   As detailed below, government, shipping, and financial
records also establish probable cause to believe that MNEIMNE is

---

[8] As noted above, the package containing the concealed
machine gun parts bound for Lebanon had been intercepted about
one week earlier, on April 30, 2020.

[9] On June 8, 2020, T.W. received a notification from Visa
Mastercard that CHARRAK was disputing the charge of $1,221.85,
placed on April 19, 2020, for the purchase of the M-16 gun
parts.  According to Visa Mastercard, CHARRAK claimed that she
did not authorize or participate in the transaction, which was
conducted in a "card-absent environment" (i.e. internet, mail-
order, phone-order, etc.).  Bank records show that CHARRAK has
both made and disputed other charges at multiple gun stores
across the United States over the past several months.  For
example, CHARRAK disputed a charge of $477.00 from Gun Store A
on May 1, 2020; a charge of $499.90 from Gun Store B on November
16, 2019; and a charge of $499.90 from Gun Store C on November
18, 2019.  CHARRAK also made additional purchases at Gun Stores
D, E, and F within the last several months, although it is not
yet clear precisely what items CHARRAK purchased.  Agents are
still in the process of investigating these additional purchases
and disputed transactions.  CHARRAK did not, however, dispute
the March 16, 2020 transaction for M-16 parts described above,
which she completed using SUBJECT ACCOUNT 1.

CHARRAK's son, and that MNEIMNE has used SUBJECT ACCOUNT 1, the Vanowen Address, and the 818-746-8199 telephone number. MNEIMNE has also previously shipped thousands of pounds of goods to Lebanon, and he has received tens of thousands of dollars from Lebanon via Western Union. In particular:

a. U.S. State Department passport and visa records show MNEIMNE submitted an application for a U.S. passport, under oath and penalty of perjury, in 2006, and listed CHARRAK as his mother.

b. When MNEIMNE applied for a second passport in 2019, MNEIMNE wrote (again under oath) that he lives at the Vanowen Address, and he provided the same phone number (818-746-8199) on his passport application that CHARRAK used to purchase the M-16 parts from T.W. in Florida.[10] MNEIME also claimed that he has previously gone by the name "Aref CHARRAK."

c. According to Wells Fargo records, MNEIMNE opened a Wells Fargo bank account in August of 2019 and the account remains active. MNEIMNE listed the Vanowen Address as his residence and SUBJECT ACCOUNT 1 as his e-mail account.

d. According to the DHS Export Cargo Database, on December 7, 2016 MNEIMNE shipped a container weighing approximately 9,438 pounds from Houston, Texas to HUSSAM SHAIB ("SHAIB") in Beirut, Lebanon. The shipping records stated that the package contained, "Shirts, Phone Case, and Scope."

---

[10] Records from California's Employment Development Department also show that, as of August 2019, MNEIMNE previously reported that he lives at the Vanowen Address and that his phone number was 818-746-8199.

e.   Between October 20, 2016 and November 23, 2019, SHAIB sent 18 Western Union money transfers to MNEIMNE totaling $25,765.  With the exception of the first transfer – which was sent to MNEIMNE in Houston two months before the 9,438-pound shipment from Houston to Lebanon - the seventeen most recent money transfers were sent to MNEIMNE in the Los Angeles area.[11]

E.   **CHARRAK and MNEIMNE Never Applied for an Export License**

28.   On May 27, 2020, DOC-BIS made a licensing determination that both M-16 Bolt Carrier Groups and M-16 Lower Parts Kits have the Export Control Classification Number ("ECCN") 0A501.C (firearms and associated commodities) and are controlled for export to Lebanon for reasons of national security, regional security, and a United Nations embargo.

29.   According to DOC-BIS, neither CHARRAK nor MNEIMNE has ever applied for or received a license to export any controlled items from the United States, including M-16 machine gun parts.

F.   **There is Probable Cause that the SUBJECT ACCOUNTS Contain Evidence of the Subject Offenses**

30.   In sum, as set forth above, CHARRAK used both SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2 to purchase M-16 gun parts from T.W., SUBJECT ACCOUNT 1 was specifically identified as the recipient's email address for a concealed shipment of M-16 gun parts to Lebanon.  Moreover, CHARRAK is MNEIMNE's mother, and MNEIMNE lives at the same Vanowen Address in Van Nuys to which some of the M-16 parts described above were initially shipped from Florida.  MNEIMNE previously described his own email

---

[11] Each Western Union transfer was below $10,000, the amount that triggers reporting requirements under federal law.

address as SUBJECT ACCOUNT 1 to open a bank account, and he
previously shipped thousands of pounds of equipment to Lebanon
in 2016, after which he received tens of thousands of dollars in
Western Union transfers from Lebanon.

31.    In addition, although agents have yet to receive
subscriber information from PROVIDER 1 for SUBJECT ACCOUNT 1,
according to PROVIDER 2, the subscriber for SUBJECT ACCOUNT 2 is
RAMINA NANO ("NANO") and the account phone number is 773-490-
7200.  Based on a review of NANO and MNEIMNE's Facebook
accounts,[12] NANO and MNEIMNE appear to be friends or in a
romantic relationship; multiple photographs show NANO and
MNEIMNE hugging.  Credit reporting data provided by Transunion
and Experian show that NANO has lived at the Vanowen Address.

32.    On June 1, 2020, federal agents sent the PROVIDERS
preservation letters requesting that information associated with
the SUBJECT ACCOUNTS be preserved for 90 days pursuant to 18
U.S.C. § 2703(f).

## VI.    TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

33.    From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

a.    Persons who possess, purchase, or illegally
export firearms and firearm parts often maintain records of

---

[12] I identified NANO and MNEIMNE's Facebook accounts by
comparing their California DMV photographs to photos posted on
the accounts, and NANO's account bears a name similar to her
legal name.

their firearm transactions in email accounts.  It has been my experience that individuals who illegally export weapons will keep the contact information of the purchaser or coconspirator abroad for future purchases or referrals.

b.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms in their social media or email accounts or digital devices.  These photographs and recordings are often shared via social media, email messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in the export of firearms or firearm parts frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess in their email accounts as they frequently send these photos to each other to facilitate sales or transfers of firearms.

## VII.  BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

34.  In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.  Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNT/S. Subscribers obtain an account by registering with the provider. During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

35.  Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute

evidence of the crimes under investigation because the
information can be used to identify the user(s) of a SUBJECT
ACCOUNT.

36.   A subscriber of the PROVIDER can also store with the
PROVIDER files in addition to e-mails or other messages, such as
address books, contact or buddy lists, calendar data, pictures
or videos (other than ones attached to e-mails), notes, and
other files, on servers maintained and/or owned by the PROVIDER.
In my training and experience, evidence of who was using an
account may be found in such information.

37.   In my training and experience, e-mail and social media
providers typically retain certain transactional information
about the creation and use of each account on their systems.
This information can include the date on which the account was
created, the length of service, records of login (i.e., session)
times and durations, the types of service utilized, the status
of the account (including whether the account is inactive or
closed), the methods used to connect to the account (such as
logging into the account via the provider's website), and other
log files that reflect usage of the account.  In addition, e-
mail and social media providers often have records of the
Internet Protocol ("IP") address used to register the account
and the IP addresses associated with particular logins to the
account.  Because every device that connects to the Internet
must use an IP address, IP address information can help to
identify which computers or other devices were used to access a
SUBJECT ACCOUNT.

38.  In my training and experience, e-mail and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of e-mails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

39.  I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal

activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account. Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with a SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

40. Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT. If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

41. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use

pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters. "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

42. This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER stores such information.

43. As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

     a. I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine. Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the

government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case. If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

b. I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers. For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted. As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account. Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VIII. REQUEST FOR NON-DISCLOSURE

44. Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court

upon application for an extension by the United States. There
is reason to believe that such notification will result in: (1)
flight from prosecution; (2) destruction of or tampering with
evidence; (3) intimidation of potential witnesses; or
(5) otherwise seriously jeopardizing the investigation. The
current investigation set forth above is not public, and I know,
based on my training and experience, that arms traffickers often
will destroy digital evidence if they learn of an investigation.
In addition, if the PROVIDER or other person notifies the
targets of the investigation that a warrant has been issued for
a SUBJECT ACCOUNT, the targets are likely to alter their
activity and seriously jeopardize the investigation.

### IX. CONCLUSION

45. Based on the foregoing, I request that the Court issue
the requested warrant. The government will execute this warrant
by serving the warrant on the PROVIDER. Because the warrant
will be served on the PROVIDER, which will then compile the
requested records at a time convenient to it, reasonable cause
exists to permit the execution of the requested warrant at any
time in the day or night.


Attested to by the applicant in
accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
___19th___ day of ___June_____ , 2020.



_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE